775 A.2d 6 (2001)
STATE of New Jersey, Plaintiff-Respondent,
v.
James J. KRIVACSKA, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 14, 2001.
Decided April 23, 2001.
*11 Adam N. Saravay, Newark, argued the cause for appellant (McCarter & English, attorneys; Mr. Saravay, on the brief).
Debra Owens, Deputy Attorney General, argued the cause for respondent (John J. Farmer, Jr., Attorney General, attorney; Ms. Owens, of counsel and on the brief).
Before Judges BAIME, CARCHMAN and LINTNER. *7 *8 *9
*10 The opinion of the court was delivered by BAIME, P.J.A.D.
Following a protracted trial, a jury found defendant guilty of one count of aggravated sexual assault (N.J.S.A. 2C:14-2a(2)), two counts of second degree endangering the welfare of a child (N.J.S.A. 2C:24-4a), and two counts of aggravated criminal sexual contact (N.J.S.A. 2C:14-3a). Defendant was acquitted of a second count of aggravated sexual assault. The trial court sentenced defendant to twenty-six years imprisonment under the Sex Offender Act (N.J.S.A. 2C:47-1 to -10). Defendant appeals. We affirm.

I.
Defendant, a licensed psychologist, was the clinical director of the Children's Center of Monmouth County, a school for individuals with special needs. The alleged victims, T.A. and M.B., were students at the school. The charges and resulting convictions stemmed from allegations that defendant sexually abused T.A. and M.B. under the guise of providing treatment for their mental and emotional infirmities. *12 The allegations were contained in an indictment which charged defendant with sexually abusing M.B., and an accusation which charged defendant with sexually abusing T.A. The charges were consolidated for the purpose of trial. Our description of the facts is taken from the voluminous trial and motion hearing transcripts.
As clinical director of the Center, defendant had a wide range of responsibilities, including intervention and behavioral counseling and the development of programs and curricula. Defendant's counseling duties often required him to meet with students in private sessions. From 1990 to September 1993, defendant's office was located in Building 5, which was known generally as the "old" building. This office was next to that of the school's director, George Scheer, and across the main entrance foyer from the office of their secretary, Arlene Kelly. Defendant's office door had a rectangular window and could not be locked because the key had been lost. Many witnesses testified that this was a highly trafficked area.
In the Autumn of 1993, defendant moved to Building 4, which was known at the time as the "new" building. Defendant's office was perhaps slightly more isolated, but nevertheless was located in close proximity to a supervisor's office, the school store, the school kitchen, and staff and student bathrooms. The office was ground-level with windows looking out into the street. The door had a rectangular window, and a lever handle with an inside button which could be pushed to lock it from the inside.
During the school year 1993-1994, T.A. was a student in Naomi Azar's class in the new building. We will describe T.A.'s mental deficits in detail later in this opinion. It is enough to note here that T.A.'s IQ score was between fifty and sixty, approaching the lowest point that can be measured. At thirteen years old, T.A. was older than the students in his class and was maturing physically. On several occasions Azar noticed that T.A. had erections in class, causing him to become nervous and flustered and preventing him from being able to answer simple questions. The problem took on added urgency because in the Spring of that school year, Azar was informed that T.A. was moving to Miami, Florida where he was to be "mainstreamed" into the public school system. Azar referred T.A. to defendant for private counseling sessions.
T.A. would go to and return from defendant's office on his own. If he did not return in an appropriate amount of time, a teacher would go to defendant's office and bring him back. According to T.A.'s testimony, it was at these private sessions that defendant sexually assaulted him. T.A. testified that defendant commonly hung his jacket on the door, covering the rectangular window. T.A. would sit in a regular chair, while defendant would be seated in a chair with wheels. Defendant would instruct T.A. to pull his pants down to midthigh, place his hands on T.A.'s penis and "shake" it until T.A. ejaculated. On one occasion, defendant allegedly "put his mouth" on T.A.'s penis. On another, defendant stood with T.A. facing him and their penises touching. According to T.A., defendant would show him photographs depicting sexual organs, which he identified on cross-examination as the drawings in a pamphlet, A Kid's First Book About Sex. Defendant would explain to T.A. the sexual organs depicted in the pamphlet.
T.A. recounted that defendant asked him to visit at his house, noting that he did not have a wife or children. T.A. thought it "odd," however, and declined defendant's invitation. Defendant cautioned T.A. never to tell anyone what happened between them.
*13 T.A. abided by that admonition until he moved to Florida. T.A. initially lived with his Aunt Jennifer. On weekends, T.A. would often visit with his Aunt Carol[1] and his Uncle Clarence. Aunt Carol was employed as a psychiatric nurse. She was also the pastor of her church. It was her habit to ask "all the children" if anyone had touched them inappropriately, or "in a private part." Aunt Carol focused particularly on T.A. because she felt he was "vulnerable." T.A. regularly denied that anyone had touched his private parts.
In July 1994, Aunt Jennifer told Aunt Carol that T.A. had been masturbating frequently and "hard," so that his bed "shook." Aunt Jennifer was concerned that her own children might hear him. Aunt Carol spoke with Uncle Clarence, who responded that "boys do masturbate and play with themselves, but not as aggressive[ly]" as Aunt Jennifer had described. Aunt Carol and Uncle Clarence confronted T.A. about the subject.
Contrary to the statement of facts in defendant's brief, the accounts of that discussion offered by T.A. and Aunt Carol markedly differ. Defendant's recitation is taken primarily from his attorney's cross-examination of T.A. in which T.A. gave essentially one word responses to defense counsel's questions. The character of that cross-examination speaks for itself. We thus quote verbatim from the trial transcript:
Q. I see, okay. So then your Aunt Carol Ruth came to you and told you that it wasn't good that you were playing with your penis, right?
A. Yes.
Q. And it wasn't good that you were making this stuff come out of it, right?
A. Yes.
Q. And is she also the one that told you that you shouldn't do that any more?
A. Yes.
Q. And that God doesn't like it?
A. Yes.
Q. Did she tell you that because you were doing that that God was angry at you?
A. Yes. And that was bad.
Q. And that was bad?
A. Yes.
Q. And that because you were doing this you were going to get in trouble, is that right?
A. Yes. Not in much trouble.
Q. Not in much trouble?
A. Yes.
Q. Did she say that, not in much trouble. Why do you say not in much trouble?
A. Because I didn't do nothing to get in trouble.
Q. Becausewell, didn't you say that God didn't like it because you were playing with your penis?
A. Yes.
Q. Okay. And that you would get in trouble for playing with your penis, isn't that right?
A. Yes.
Q. Okay. So did she also say to you that somebody must have taught you how to do this? You remember her saying that?
A. Yes.
*14 Q. She told you that?
A. She asked me did anybody do this to you before?
Q. Let's just back up for a minute.
A. Okay.
Q. She wantedisn't it true that she wanted to know where you learned to do this?
A. Yes.
Q. She said that somebody had to teach you to do this, correct?
A. Yes.
Q. And you told her who taught you to do this, didn't you?
A. Yes.
T.A. testified that Aunt Carol repeatedly asked him whether anyone had touched his private parts. T.A. claimed that although he initially denied any such activity, he ultimately identified defendant as the perpetrator. According to T.A., "she finally got [it] out of me after she asked me [the same question] a hundred times."
Aunt Carol steadfastly denied that she or Clarence had told T.A. that God would be angry at him for masturbating. She also denied that she or Clarence told T.A. someone must have taught him to masturbate. According to Aunt Carol, she made it clear that masturbation was normal behavior, but that T.A. should engage in that activity only in the privacy of his room or in the shower. Because T.A. appeared nervous with Clarence in the room, Clarence decided at some point to excuse himself. Aunt Carol testified that she asked T.A. whether anyone had taught him to masturbate. After being assured that he would not get into trouble, T.A. identified defendant as the perpetrator.
After that initial disclosure, T.A. initiated several conversations with Aunt Carol, basically repeating what he had told her earlier. According to Aunt Carol, T.A. "would start talking about it when [the two] were together." T.A. told her that the incidents had occurred in a room which he described. Although initially, Aunt Carol "assumed" that T.A. was referring to a school auditorium, T.A. subsequently corrected himself and told her that "Dr. Jim would take him to his office." When Aunt Carol questioned him about the subject, T.A. denied that "there was any oral sex."
As a result of T.A.'s disclosures, Aunt Carol contacted Florida authorities. Detective Debra Blesso-Chiota of the Orange County Sheriff's Office interviewed T.A. at Aunt Jennifer's house on August 10, 1994. The interview was audiotaped. However, the tape was subsequently lost. The transcript of the interview discloses that T.A. generally repeated the allegations he had previously made to Aunt Carol. T.A. told Blesso-Chiota that defendant would show him sexually explicit photographs. According to T.A., he and defendant would "open their pants" and touch each other's private parts. T.A. noted that he and defendant would ejaculate, and clean off their hands with tissues. T.A. added one detail that he had not told Aunt Carol earlier. Specifically, T.A. said that on at least one occasion, defendant had "put his mouth on" T.A.'s penis. T.A. noted that he had been "too scared to tell [his] aunt."
T.A. apparently repeated these allegations in subsequent interviews with Detective Lonnie Mason of the Monmouth County Prosecutor's office. We have underscored the word "apparently," because these interviews were neither taped nor stenographically recorded. We add that these discussions occurred in the presence of several family members and an assistant prosecutor. T.A. repeated these allegations when questioned by the State's expert, Dr. Philip Witt. The latter interviews also were neither taped nor stenographically recorded.
*15 T.A.'s interview with the defense's expert, Dr. Ralph Underwager, was videotaped. We have observed the tape. T.A. appears extremely reluctant to describe his relationship with defendant. He says only that defendant engaged in "gross" activities after showing him pictures, and that he was frightened during these episodes. After a short break, T.A. appears more forthcoming in his description of the incidents, noting that he and defendant would touch each other's private parts and ejaculate.
We now shift to the allegations contained in the indictment. These pertained to M.B. The State and defense experts agreed that M.B.'s mental disabilities were more severe than T.A.'s. M.B.'s IQ was from 49 to the low 50's, placing him in the moderately retarded range. M.B.'s cognitive impairments are manifestations of a genetic disorder known as "Fragile X Syndrome." This condition presents a distinctive set of symptoms, including mental retardation, echolalia (repeating words or phrases spoken by others), delayed echolalia (repeating words or phrases spoken by others long after hearing them), and perseveration (fixating on words or phrases for lengthy periods). Persons afflicted with this syndrome tend to be quiescent when facing "confrontational questioning" in order to alleviate stress and anxiety. Moreover, their anxiety thresholds are lower than most people.
M.B. began attending the Center in February 1991, when he was thirteen years old. His classroom was in the "old" building. M.B. was physically and verbally aggressive and very easily agitated. He often "acted out" in the classroom as the result of overstimulation. M.B.'s parents were actively involved in M.B.'s education at the Center. M.B.'s father often conducted his business using an office at the school. On occasion, he would enter the classroom in an attempt to calm M.B.'s anxiety. M.B.'s mother served as a classroom assistant.
While M.B.'s classroom was in the old building, defendant would conduct private sessions with him in his office. In September 1993, M.B.'s class moved to the new building. M.B. continued to spend time with defendant in defendant's new office, but less than before.
M.B. claimed that defendant sexually assaulted him during these private sessions. According to M.B., defendant would lock the office door, remove his jacket or sweater and hang it on a hook, thus obscuring the view of those in the hallway. M.B. testified that defendant and he touched each other's private parts. After they would ejaculate, defendant would put the "mess" in a paper bag and discard it in a wastepaper basket. M.B. recounted that on one occasion, defendant placed a "paper baggie" over his penis, and attempted to put his penis in M.B.'s "heinie." Defendant warned M.B. not to tell anyone.
During this period, M.B. would "cut up" his underwear when he came home from school. M.B. would also take showers immediately after he arrived home. According to M.B., he was "really angry" at defendant and wanted to "get [him] in trouble," but nevertheless did not apprise his parents of defendant's sexual misconduct.
M.B. kept defendant's secret for a long time. On December 30, 1994, M.B.'s grandmother, Joan Ohmott, was babysitting for M.B. and his siblings. At approximately 11:00 p.m., Ohmott found M.B. sitting in the dark, yelling into a toy microphone. Ohmott described M.B.'s demeanor as "upset, mad [and] anxious." M.B. told Ohmott he wanted to tell her something but was afraid she would "get mad at him." At that point, M.B. told Ohmott about defendant's sexual abuse.
*16 The next morning, Ohmott told M.B.'s mother. M.B. repeated his allegations to his mother, and then to his father. Because of the holidays, M.B.'s parents were unable to contact the Monmouth County Prosecutor's Office until January 3, 1995, when they, Ohmott and M.B. met with Detective Mason. Mason interviewed M.B., his parents, and his grandmother together for approximately one hour. Apparently, an assistant prosecutor and a representative from the Division of Youth and Family Services were also present. M.B. repeated his allegations during this interview. However, the "question and answer" session was not videotaped, audiotaped or otherwise recorded.
Mason then took a seven-page statement from M.B. The statement was typed as it was being taken. M.B.'s parents were present, and on several occasions interpreted M.B.'s responses. Experts for the prosecution and the defense agreed that Mason's questions were "leading" and "suggestive." He began by telling M.B. that his inquiry concerned "incidents that have occurred at the [Center] where you were touched by an individual known to you as Dr. Jim." After several preliminary questions, Mason asked M.B. about "incidents where you were touched by Dr. Jim." M.B. responded by saying that defendant touched his "heinie" and "played with [his] pee-pee." According to M.B., on one occasion defendant "tried to put his pee-pee in [his] heinie." M.B. related that defendant would lock the door by pushing the button in the door knob and cover the door window with his coat.
Like T.A., M.B. repeated these allegations in subsequent interviews. Dr. Underwager evaluated M.B. in April and September 1996. The interview was videotaped, and we have had the opportunity to view it. At the very inception of the interview, M.B. volunteered that defendant would lock the door to his office, hang his coat over the rectangular door window, and touch his "body parts" and "heinie." M.B. told Underwager that defendant had committed the same acts on T.A. and was "going to be put in jail for the rest of his life." M.B. did not mention touching defendant's penis. Nor did he allege that defendant attempted to have anal intercourse with him.
M.B.'s unrecorded interview with the State's expert, Dr. Witt, produced largely similar results. Witt described M.B. as "eager" to tell him about defendant's sexual acts. According to Witt, "with very little prompting, [M.B.] recounted" what occurred during his private sessions with defendant. M.B.'s description of the incidents was consistent with his earlier accounts. Unlike his interview with Underwager, however, M.B. described in detail defendant's attempt at anal intercourse.
Defendant did not testify at trial. However, the defense presented several witnesses who testified that they had free access to defendant's office. Azar testified that on the occasions when she had to get T.A. from defendant's office, she would "just walk in," whether or not she knocked first. She noted, however, that sometimes there was a sweater or suit jacket hanging over the window of the door. M.B.'s teacher, Diane Campbell, testified that M.B. always had to be accompanied to and from defendant's office. According to Campbell, she never found the office door locked. She would knock and be granted access immediately.
Defendant also elicited testimony about an incident in February 1991, when M.B. complained at school that his "heinie" hurt because his nine-year old cousin, Joey, had put his penis in M.B.'s rectum. The truth or falsity of this allegation was never clearly established. Ohmott described an incident in 1990 when she noticed that Joey *17 and M.B. were in a bedroom with the door shut. Because the bedroom was very quiet, Ohmott decided to investigate. She found the boys alone with their penises exposed. Ohmott dismissed the incident because the children had been alone for only a short period of time.
It is against this factual backdrop that defendant appeals the judgment encompassing the jury's verdict. Defendant argues: (1) the coercive and suggestive interview techniques rendered the testimony of T.A. and M.B. unreliable and inadmissible, (2) the grand jury proceedings were tainted by Detective Mason's inaccurate statement, (3) the trial judge erred in finding T.A. and M.B. competent to testify, (4) defendant's right to confrontation was denied because his attorney was not allowed to cross-examine T.A. and M.B. in the hearing to determine whether they were competent, (5) the judge abused his discretion by joining the accusation and the indictment and by failing to give an appropriate limiting instruction on the jury's use of "other crime" evidence, and (6) the out-of-court statements of T.A. and M.B. were erroneously admitted. The State cross-appeals, contending that the judge's decision to merge several of the offenses was in error.

II.
We first consider defendant's argument that the testimony of T.A. and M.B. was tainted by the coercive and suggestive interview techniques utilized in obtaining their statements. The judge conducted a lengthy hearing pertaining to this question. We have already described some of the salient facts. We supplement that description here. At the outset, however, we note that the hearing was extensive and involved other issues as well as that of reliability and taint. We thus recite only those facts essential to our disposition of the issue presented.
We begin by describing Dr. Underwager's testimony. Underwager first considered Aunt Carol's interview with T.A., which he characterized as leading and coercive. Because Aunt Carol and Uncle Clarence were present at the initial stage of the interview, and were viewed by T.A. as "authority figures," Underwager observed that there was an "increased likelihood" T.A. would conform his answer to what he believed they wanted him to say. We note that Underwager's understanding of the circumstances surrounding the interview was based upon T.A.'s version and Mason's summary. As we pointed out earlier, Aunt Carol denied much of the coercive techniques described in these accounts.
Underwager's examination of T.A. confirmed his suspicion that T.A.'s statements to Aunt Carol, and to a lesser extent to Detective Blesso-Chiota, were contaminated and unreliable. According to Underwager, T.A. immediately launched into a description of defendant's misconduct, thus suggesting that he had been "primed" by others. Underwager testified that T.A.'s statements were "disjointed" and did not follow "any necessary sequential patterning." Underwager observed that T.A. could not recall events in reverse sequence. The doctor thus concluded that T.A.'s statements were not the product of his memory or visual images, but instead were based upon "scripts" that he had learned. Underwager also pointed to clinical tests that corroborated his opinion.
Underwager offered a similar opinion respecting M.B. Although Ohmott's interview with M.B. was neither suggestive nor coercive, Mason's interview technique was found to be substantially flawed. Underwager pointed specifically to Mason's highly leading questions propounded at the *18 beginning of M.B.'s seven-page statement. Underwager's examination of M.B. confirmed his suspicions. Like T.A., M.B. volunteered information concerning defendant without any prompting. This suggested to Underwager that M.B. was "ready" and "primed," i.e., that he "was aware of what he was expected to [say]." Clinical tests pointed to the same conclusion. According to Underwager, M.B. was not capable of engaging in logical thinking or reasoning, but rather tended to respond to "environmental cues."
The defense's forensic psychologist, Gerald Cooke, corroborated Underwager's conclusions with respect to T.A. and M.B. Cooke determined that the statements taken from both alleged victims were "not consistent with [sound] interviewing techniques." In reaching his conclusion, Cooke relied upon T.A.'s description of his discussion with Aunt Carol and Uncle Clarence, as well as Mason's summary of the statement he took from Aunt Carol. Cooke also criticized Detective Blesso-Chiota's interview techniques.
Cook found that Ohmott's questioning of M.B. tended to distort M.B.'s ability to recall and recount the relevant facts. As to M.B., Cooke criticized Mason's use of leading questions in taking M.B.'s statement, and his failure to separate M.B. from the presence of his parents. Cooke further noted that Mason used language that was much too sophisticated, and that the questions propounded were too lengthy and complicated.
As we noted earlier, Dr. Witt testified for the State. Witt recounted that T.A. provided a cohesive statement concerning defendant's activities in response to "open-ended" questions. T.A.'s account of the incidents was "reasonably similar" to his prior statements. Witt believed that T.A. did not perform as well in his interview by Underwager because of Underwager's use of the "quite novel and quite difficult" technique of asking questions in reverse chronological order. Also, the use of videotaping equipment tended to distort T.A.'s ability to focus. While conceding that T.A.'s "level of suggestibility" was high, Witt stressed that T.A. "resisted" statements that he knew were untrue. Witt pointed to several instances in which T.A. corrected Underwager's statements.
Witt testified that M.B. was "cognitively impaired," and that such an individual was more susceptible to suggestion than "non-cognitively impaired" people. Asked whether M.B. could have been coached and fed the explanation of what had happened with defendant, Witt responded that M.B. was not "smart enough" to remember a well-structured explanation of what had occurred. Witt emphasized that M.B. was quick to resist any attempt Witt made in suggesting responses. For example, M.B. corrected Witt's statement that defendant called him out of class, noting that his teacher always accompanied him to and from defendant's office. When Witt referred to defendant as "Dr. Krivacska," M.B. insisted that he knew him as "Dr. Jim." Witt found that M.B. did not acquiesce in a statement or suggestive question when an event was part of his own experience.
Dr. Kathryn Hall also testified for the State. While conceding the flaws in Aunt Carol's questioning of T.A. and Mason's questioning of M.B., Hall concluded that these errors did not taint the alleged victims' ability to recall the events in question and to accurately depict such events in their testimony. In reaching this conclusion, Hall considered: "the conditions that were prevalent at the time of the child's original report of [the] criminal event[,][t]he circumstances under which the initial report was made[,][h]ow many times the child was questioned[,][t]he hypothesis *19 of the interviewers who questioned the child[,][a]nd the kinds of questions the child was asked as well as the consistency of the child's report over time."
With respect to T.A., there was no indication that Aunt Carol knew of, or was biased against, defendant when she initially questioned the alleged victim. Hall also emphasized that T.A. had an independent recollection of the events and that he had resisted many of the suggestions contained in Aunt Carol's questions. She also stressed that, except for the allegation concerning oral sex, T.A.'s description of the events remained consistent over time. Blesso-Chiota asked several leading questions in her interview of T.A., but no bias against defendant was evident in the questions she propounded. Hall stressed that T.A.'s responses often went "beyond the lead" that was given to him in the questions asked. She also emphasized that T.A. steadfastly resisted suggestions that he believed were incorrect. According to Hall, T.A.'s ability to resist leading questions by Aunt Carol, Blesso-Chiota and Underwager suggested strongly that T.A. "maintained an independent recollection of the events." Because T.A. did not rely upon the questions to inform him of the answers, Hall "very strongly" believed that T.A.'s ability to recall and to testify was not "irreparably tainted" by the interview techniques that had been employed. Hall opined that T.A.'s answers reflected an independent recollection of the events explored. Hall found that T.A.'s statements had not been "unduly tainted by the questioning and interviewing that ha[d] occurred."
With respect to M.B., Hall observed that his initial statements to Ohmott were entirely spontaneous and voluntary. Neither Ohmott nor M.B.'s parents exhibited any bias against defendant. Nor did the questions they propounded contain suggestions relating to what had occurred. However, Hall was sharply critical of Mason's questioning of M.B. She nevertheless stressed that M.B.'s answers went beyond the cues contained in Mason's questions. The witness concluded that M.B.'s ability to provide an accurate account of the events was not compromised.
The trial judge issued a letter opinion denying defendant's motion to bar T.A. and M.B. from testifying based upon the interview techniques employed. While finding that Carol Ruth's questioning of T.A. was leading, the judge concluded that T.A. was able to provide testimony based upon his independent recollection of the events in question and was not tainted. The judge "likewise [found] no evidence of taint" arising out of Detective Blesso-Chiota's interview of T.A. The judge emphasized that although prior questioning had its suggestive aspects, "[t]he defendant's name was never suggested to T.A. [and] there was no praise, no rewards, [and] no punishment threatened."
As to M.B., the judge determined that the alleged victim's initial disclosure to Ohmott was entirely spontaneous. However, questions propounded by Detective Mason were leading. The judge nonetheless emphasized that Mason had questioned M.B. before taking his seven-page statement, and that the leading questions asked in the formal statement were merely designed to focus M.B.'s attention on the allegations he had made previously. In any event, both as to T.A. and M.B., the judge found "by clear and convincing evidence that the proffered statements of [the alleged victims] were reliable and that the investigatory procedures employed... did not have the effect of tainting [their] recollection of the events."
The applicable principles were described in State v. Michaels, 136 N.J. 299, 642 *20 A.2d 1372 (1994). See also State v. Scherzer, 301 N.J.Super. 363, 464, 694 A.2d 196 (App.Div.), certif. denied, 151 N.J. 466, 700 A.2d 878 (1997). The focus of that decision was the manner in which the prosecution conducted its investigatory interviews with a group of nursery school students who had allegedly been sexually abused by their teacher. We need not describe the circumstances of the investigation in detail. It suffices to note that the children had been interviewed in the presence of one another, they had been cajoled and coerced into making bizarre allegations concerning the teacher's activities, and otherwise had been coerced in repeated interviews into giving incriminating accounts of the teacher's behavior. Against that background, our Supreme Court observed, "[t]he question of whether the interviews of the child victims of alleged sexual-abuse were unduly suggestive and coercive requires a highly reasoned inquiry into the totality of circumstances surrounding these interviews." Id. at 306, 642 A.2d 1372. The Court stressed that "special care [must] be taken to ensure [the] reliability [of their description of the events]." Ibid.
Synthesizing principles enunciated in scholarly commentary, see Gail S. Goodman and Vicki S. Helgeson, Child Sexual Assault: Children's Memory and the Law, 40 U. Miami L.Rev. 181 (1985); Diana Younts, Evaluating and Admitting Expert Opinion Testimony In Child Sexual Abuse Prosecutions, 41 Duke L.J. 691 (1991), the Court noted the "variety of factors bear[ing] on the kinds of interrogation that can affect the reliability of a child's statements concerning sexual abuse." State v. Michaels, 136 N.J. at 309, 642 A.2d 1372. Among the factors cited as having the potential to undermine the neutrality of an interview and create undue suggestiveness were "a lack of investigatory independence, the pursuit by an interviewer of a preconceived notion of what has happened to the child, the use of leading questions, and a lack of control for outside influence on the child's statements, such as previous conversations with parents or peers." Ibid.; see also John E.B. Meyers, The Child Witness: Techniques for Direct Examination, Cross-Examination, and Impeachment, 18 Pac. L.J. 801, 899 (1987) (factors include: (1) whether interviewer believes in presumption of guilt, (2) whether questions asked are leading, and (3) whether interviewer is a trusted authority figure). The Court added that "[t]he use of incessantly repeated questions ... adds a manipulative element to an interview," and "[t]he explicit vilification or criticism of the person charged with wrongdoing is [a] factor that can induce a child to believe abuse has occurred." Id. at 310, 642 A.2d 1372.
Citing guidelines adopted by the National Center for the Prosecution of Child Abuse, the Court stated that the interviewer must: (1) "remain `open, neutral and objective,'" (2) "avoid asking leading questions," (3) "never threaten a child or force a reluctant child to talk," and (4) "refrain from telling a child what others, especially other children, have reported." Id. at 311, 642 A.2d 1372. The Court further observed the failure to videotape interviews with child victims provides a potential for the elicitation of unreliable information. Id. at 312, 642 A.2d 1372 (citing Idaho v. Wright, 497 U.S. 805, 812, 110 S.Ct. 3139, 3145, 111 L.Ed. 2d 638, 650 (1990); State v. Hill, 121 N.J. 150, 168, 578 A.2d 370 (1990); State v. Bethune, 121 N.J. 137, 145, 578 A.2d 364 (1990); State v. R.M., 245 N.J.Super. 504, 516, 586 A.2d 290 (App.Div.1991); State v. M.Z., 241 N.J.Super. 444, 451, 575 A.2d 82 (Law Div.1990)).
Finding that "the use of coercive or highly suggestive interrogation techniques *21 can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements and subsequent testimony concerning such events," the Court adopted the following rules. Ibid. A defendant is entitled to a "pretrial taint" hearing once he makes a showing of "some evidence" that the victim's statements were the product of suggestive or coercive interview techniques. Id. at 320, 642 A.2d 1372. Once a defendant establishes that sufficient evidence of unreliability exists, the burden shifts to the State to prove the reliability of the proffered statements and testimony by clear and convincing evidence. Ibid. The ultimate determination to be made is whether, despite the presence of some suggestive or coercive interview techniques, when considering the totality of the circumstances surrounding the interview, the statements or testimony retain a degree of reliability sufficient to outweigh the effects of the improper interview techniques. Id. at 321, 642 A.2d 1372. The State and defense are entitled to call expert witnesses to offer testimony with regard to the suggestive capacity of the suspect investigative procedures. Ibid. However, the relevance of expert opinion focusing essentially on the propriety of the interrogation should not extend to or encompass the ultimate issue of credibility of an individual child witness. Id. at 321-22, 642 A.2d 1372. The State is entitled to demonstrate the reliability of the child's statements or testimony by proffering independent indicia of reliability. Id. at 322, 642 A.2d 1372.
We hold that the trial judge faithfully adhered to this analytical framework, and that his ultimate factual findings and conclusions were reasonably supported by the evidence. We first find no sound basis to disturb the judge's findings respecting T.A. In reaching this conclusion, we note that Aunt Carol was a person T.A. would normally turn to in confiding a questionable sexual incident. While Aunt Carol's interview technique did not satisfy the prescriptions that normally attend police interrogations, she was not a law enforcement officer and could not reasonably have been expected to be aware of, and follow, sophisticated interview methodology. Unfortunately, T.A.'s description of the interview markedly differed with Aunt Carol's account, and no findings were made with respect to which of the two versions was accurate. As noted by Witt and Hall, assuming that Aunt Carol's techniques had elements of coercion, there was substantial evidence that T.A. resisted. T.A. exhibited no signs of "post-event and post-recitation distress." Indeed, it was undisputed that T.A. showed signs of feeling relieved following his disclosures to Aunt Carol.
Detective Blesso-Chiota's interview of T.A. did not suffer from the same infirmities. The detective made a reasonable effort to gain T.A.'s confidence. Although several of her questions were somewhat leading, many of her inquiries were essentially open-ended. Blesso-Chiota's questions did not evidence a bias against defendant. The judge could reasonably have found that T.A.'s statement was made under conditions likely to elicit truthfulness. Id. at 311, 642 A.2d 1372.
We next find nothing amiss in the judge's findings with regard to M.B. M.B.'s statement to his grandmother concerning defendant's sexual abuse was essentially spontaneous and volunteered. Ohmott hardly questioned M.B. concerning his allegations. Nothing in the record suggests that the inquiries she did make were in pursuit of a preconceived notion of what had happened. Likewise, there is no evidence suggesting that Ohmott harbored any bias as to defendant's guilt or innocence. *22 [2] Nor is there any evidence indicating that she asked leading questions, or that she uttered threats or cajoled the alleged victim, or that she vilified or criticized defendant. In short, the record does not in any way suggest that Ohmott suggested information to M.B. in the course of the interview.
We acknowledge the infirmities in the interview techniques employed by Detective Mason. Mason's decision not to videotape or audiotape the interview is particularly disconcerting because his meeting with M.B. and his parents took place some time after the Michaels opinion was rendered.[3] Moreover, Mason's use of leading questions clearly evidenced a preconceived notion of what had transpired between M.B. and defendant. We nevertheless emphasize, as did Witt and Hall, that M.B.'s answers often went beyond the cues contained in Mason's questions. Moreover, M.B. resisted Mason's suggestions, clearly evidencing the fact that his responses were based upon independent recollection of the events.
That leads us to defendant's claim that the trial judge erred by admitting, and relying upon, Dr. Hall's expert testimony concerning the question of taint. In support of his argument, defendant asserts that Hall "used an idiosyncratic clinical approach to conclude that T.A. and M.B. were reliable because they resisted the suggestions" contained in several of the questions propounded.[4] We note that Hall had substantial experience in questioning victims of sexual abuse. Her reliance upon the alleged victims' refusal to bend their answers to meet the suggestions advanced in their interviewers' inquiries would seem to comport with common sense and common experience. In any event, Hall's testimony was of a nature to assist the judge in understanding whether the victims' statements and trial accounts were reliable or contaminated. See N.J.R.E. 702. We conclude that her testimony: (1) concerned a subject beyond the ken of the average person, (2) pertained to a field of inquiry that was sufficiently reliable, and (3) fell within the purview of the witness's expertise. State v. Kelly, 97 N.J. 178, 208, 478 A.2d 364 (1984).
There is no question but that T.A. and M.B. were not ideal witnesses. So too, it *23 is plain that several of those who interviewed the alleged victims were less than sensitive in the techniques they employed. We are nonetheless entirely satisfied that the trial judge was not wide of the mark in his essential finding that T.A. and M.B. retained their ability to give a full and fair account of what happened to them in their private sessions with defendant.

III.
We turn to the question of the competency of T.A. and M.B. to testify. We again supplement our prior recitation of the facts.
We begin with Underwager's testimony. Underwager administered a series of tests to determine T.A.'s capacity to testify. The doctor found that although T.A. was able to produce "recognizable versions" of designs, he made a "significant number of errors," some of which suggested "brain dysfunction." T.A. could not produce designs from memory. Clinical tests indicated that T.A.'s performance was "borderline" with respect to his ability to process information, code, and retrieve and store facts. When asked whether the test results "impacted" upon T.A.'s ability to distinguish between fantasy and reality, Underwager's somewhat equivocal response was:
The specific brain dysfunction that T.A. demonstrates may not be related to those issues that [sic] any direct way. We just don't I don't know enough about the brain dysfunction other than the fact that its [sic], he's been diagnosed as seizure disorder. The main things [sic] for these two tests is that there is indication of brain dysfunction.
Is [sic] also the indication of the difficulty in processing information and that memory abilities. And that's where you have the impact or the effect on the question you are asking me about comprehension of oath and so on.
As I indicated earlier the ability to have memory is absolutely basic to the cognitive skills required to do that. And here this young lad does give indication of memory deficits. There maybe [sic] a relationship to the specific brain dysfunction and certainly a brain dysfunction does have impact; but, I would not [sic] able to say specifically how that might work.
Underwager nevertheless concluded that T.A. did not have the capacity to comply with the oath to tell the truth as opposed to providing a script of what T.A. believed others wanted to hear. Underwager concluded, "[g]iven the lad's high level of suggestibility and the level of his cognitive capacities and the difficulty he has in processing information, ... he is not capable of doing those things as required by law."
Underwager also concluded that M.B. did not have the mental capacity to testify. Because M.B.'s retardation and Fragile X Syndrome rendered him incapable of "being aware of [his] own thinking process, [he] could not be relied upon to know what [][is] true and what[ ][is] false." Based upon tests administered to M.B., Underwager considered that M.B. did not have the "cognitive ability to think, to understand, [and] to be aware of what his behaviors [were]." As an example, Underwager observed that at one point in his interview with M.B., M.B. asked Underwager whether he, M.B., was telling the truth. Like T.A., M.B. was said to lack the capacity "to encode, store and retrieve memory."
Witt disagreed with Underwager's assessment. While acknowledging that T.A. performed poorly in distinguishing truth from falsity in responding to Detective Blesso-Chiota's initial questions, Witt found that T.A. was able to provide a "relatively lengthy and appropriate narrative *24 differentiating accuracy from inaccuracy." Witt observed that T.A. could distinguish between the truth and a lie "quite adequately." T.A. understood that one had the duty to tell the truth and that one would be punished for telling a lie.
Witt was "fairly impressed" with M.B.'s ability to distinguish between truth and falsity. M.B. was able to define the word "lie" in general terms. More importantly, M.B. was able to give examples demonstrating the difference between truth and a lie. When told that the walls of Witt's office were green, M.B. responded that the statement was untrue because the walls were actually white. M.B. also understood that he was duty-bound to tell the truth, and that he would be punished if he failed in that obligation.
In an effort to ascertain their testimonial capacity, the trial judge questioned both T.A. and M.B. In response to the judge's questions, T.A. explained that the truth was "good" and a lie is "bad." He also explained that if one told a lie one would "get in trouble." T.A. was able to differentiate between truth and falsity in a variety of hypothetical factual settings. For example, the judge asked, "[w]hat if ... you took a cookie out of a cookie jar and your mother or aunt or your grandmother [asks], who took the cookie out of the cookie jar, and you said I did.... Would that be the truth or a lie?" T.A. responded that the answer would be true. The judge next asked, "[i]f you ... bump into a lamp ... and it [breaks], and your mom or your aunt or your grandmother [asks] who broke the lamp, and you said, I [did not] break the lamp, would that be the truth or a lie?" T.A. responded, "[a] lie, because I did [break the lamp]." Based upon these responses and others, as well as Witt's expert opinion, the judge concluded that T.A., had the requisite capacity to testify as a witness.
M.B.'s response to the judge's questions were more equivocal. At first, M.B. represented that he knew the difference between telling the truth and telling a lie. He then said that he did not know the difference. M.B. thereafter volunteered, "[y]ou have to tell the honest truth" because "you could get into trouble ... [and] go to jail ... if you [did] not." The judge then focused on concrete examples to discern whether M.B. actually could distinguish between truth and falsity. M.B. responded appropriately when presented with the cookie jar, lamp and other scenarios. The judge found that M.B. was capable of distinguishing truth from falsity, understood his duty to tell the truth, and appreciated the fact that he would be punished if he lied.
Before addressing defendant's substantive arguments, we examine several of his preliminary points. We first consider his attack upon Dr. Witt's qualifications to give an opinion on a witness's competency. We reject this contention. The record indicates that Witt received his doctorate in clinical psychology in 1976. From 1976 to 1980, Witt taught core clinical courses in Seton Hall's graduate psychology program. Since 1987, he has maintained a full-time practice. While Witt had experience in evaluating mentally handicapped individuals, he admitted that this was not his specialty. Witt had no specific experience dealing with patients afflicted by Fragile X Syndrome.
We recognize the deficiencies in Witt's qualifications. We are nevertheless satisfied that the trial judge properly exercised his discretion in determining that Witt was qualified to testify as an expert witness. The sufficiency of a proposed expert's qualifications is a matter best left to a trial court's discretion, and is to be reversed only for manifest error. See State v. Moore, 122 N.J. 420, 459, 585 A.2d *25 864 (1991) (quoting State v. Ravenell, 43 N.J. 171, 182, 203 A.2d 13 (1964), cert. denied, 379 U.S. 982, 85 S.Ct. 690, 13 L.Ed.2d 572 (1965)). We perceive no abuse of the judge's discretionary powers here.
We also reject defendant's argument that the trial judge's refusal to permit defense counsel to cross-examine T.A. and M.B. at the hearing to determine their competency to testify violated his right to confrontation. At the pretrial hearing, the trial judge allowed defense counsel to question the alleged victims concerning their ability to communicate, but he denied the attorney's request to question them as to their ability to understand their duty to tell the truth.
The determination of a witness's competency to testify "is made upon a preliminary examination by the trial court." State v. Walton, 72 N.J.Super. 527, 532, 179 A.2d 78 (Co.Ct.,Law Div.1962). It has long been settled "`that the competency of a child to be a witness is a matter for inquiry by the trial judge and rests largely in his discretion.'" Ibid. (quoting State v. Gambutti, 36 N.J.Super. 219, 223, 115 A.2d 136 (App.Div.1955)) Thus, the trial judge in this case merely followed settled practice.
We are satisfied that the Sixth Amendment right of confrontation was not implicated in the judge's preliminary inquiry concerning the competency of the witnesses. In Kentucky v. Stincer, 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987), the United States Supreme Court held that the exclusion of a defendant from a hearing held to determine the competency of two child witnesses to testify did not violate the Due Process Clause of the Fourteenth Amendment or the Confrontation Clause of the Sixth Amendment. Id. at 747, 107 S.Ct. at 2668, 96 L.Ed.2d at 648. The Court reasoned that excluding the defendant from the hearing did not interfere with his opportunity for effective cross-examination of the witnesses in the course of the trial. Id. at 740, 107 S.Ct. at 2664, 96 L.Ed.2d at 644. As observed by the Court, "the type of questions ... asked at the competency hearing [was] easy to repeat on cross-examination at trial." Id. at 741, 107 S.Ct. at 2665, 96 L.Ed.2d at 644. The Court further noted that "questions at a competency hearing usually are limited to matters that are unrelated to the basic issues of the trial." Ibid.
While we have found no reported New Jersey opinion dealing with the precise issue, we note that the decisions of other jurisdictions comport with Stincer's holding that the opportunity to cross-examine witnesses at trial satisfies the right of confrontation, thereby allowing the exclusion of the defendant at a competency hearing. See, e.g., Gardner v. State, 641 N.E.2d 641, 644 (Ind.Ct.App.1994); See v. Commonwealth of Kentucky, 746 S.W.2d 401, 402 (Ky.1988); State v. Thompson 427 N.W.2d 266, 270 (Minn.Ct.App.1988); People v. Morales, 80 N.Y.2d 450, 454, 591 N.Y.S.2d 825, 606 N.E.2d 953, 956 (1992); State v. McMillan, 62 Ohio App.3d 565, 568, 577 N.E.2d 91, 93 (1989).
While we recognize that the issue raised here is slightly different, we find controlling Stincer and the other cases we have cited. Although defense counsel was partially barred from questioning the alleged victims at the pretrial competency hearing, the attorney was granted wide latitude to pursue this subject in his subsequent cross-examination of T.A. and M.B. Moreover, defense counsel fully availed himself of that opportunity. The attorney's cross-examination was extensive, and all of the relevant circumstances were placed before the jury. We discern no constitutional violation.
*26 We add for the sake of completeness that the judge's denial of defendant's pretrial motion to examine the alleged victims' school records was not violative of the right of confrontation. A child's school records are confidential, and access to their contents is limited. See N.J.A.C. 6:3-6.4, -6.5; N.J.A.C. 6A:14-2.9. Under some circumstances, a defendant's right of confrontation may trump a juvenile witness's right of privacy. See, e.g., Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). We assume, therefore, that school records relevant to the issue of competency of a child witness should be disclosed to a defendant upon a showing of particularized need.
This much conceded, "allowing a defendant to forage for evidence is not an ingredient of either due process or fundamental fairness in the administration of the criminal laws." State v. R.W., 104 N.J. 14, 28, 514 A.2d 1287 (1986). The Confrontation Clause is not a constitutionally compelled right to discovery in a criminal case. Pennsylvania v. Ritchie, 480 U.S. 39, 52-53, 107 S.Ct. 989, 999, 94 L.Ed.2d 40, 54 (1987). It does not require disclosure of any and all information that perhaps might be useful in contradicting unfavorable testimony. Ibid.; see also State v. Harris, 316 N.J.Super. 384, 397-98, 720 A.2d 425 (App.Div.1998).
We are convinced that the trial judge properly balanced the alleged victims' right to privacy with defendant's right of confrontation by examining the school records in camera. This procedure has been recommended by the Supreme Court, see State v. Boiardo, 82 N.J. 446, 467, 414 A.2d 14 (1980), and by this court, see State v. Harris, 316 N.J.Super. at 398, 720 A.2d 425; State v. Kennedy, 247 N.J.Super. 21, 34, 588 A.2d 834 (App.Div.1991); State v.Cusick, 219 N.J.Super. 452, 459, 530 A.2d 806 (App.Div.1987); State v. McBride, 213 N.J.Super. 255, 271, 517 A.2d 152 (App.Div.1986); United Jersey Bank v. Wolosoff, 196 N.J.Super. 553, 563, 483 A.2d 821 (App.Div.1984); Newark Bd. of Educ. v. Newark Teachers' Union, 152 N.J.Super. 51, 62 n. 3 and n. 4, 377 A.2d 765 (App.Div.1977); State v. Braeunig, 122 N.J.Super. 319, 330, 300 A.2d 346 (App.Div.1973), in a wide variety of factual settings. The judge correctly applied that procedure here.
Within that context, we find no merit in defendant's claim that only an expert would know what to look for in the school files of the alleged victims. The judge was fully aware of the factual and legal issues raised, and had the ability to make reasoned decisions concerning what was relevant and what was not. We thus find no constitutional violation.
We now address the pivotal question whether the judge erred by finding T.A. and M.B. competent to testify. N.J.R.E. 601 provides:
Every person is competent to be a witness unless (a) the judge finds that the proposed witness is incapable of expression concerning the matter so as to be understood by the judge and jury either directly or through interpretation, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth, or (c) except as otherwise provided by these rules or by law.
Thus, every person is presumed competent to testify. State v. Scherzer, 301 N.J.Super. at 463, 694 A.2d 196. Disqualification "is the exception to the general rule of witness competency." Ibid. The determination of whether a person is competent to serve as a witness lies within the discretion of the court. State v. R.W., 104 N.J. at 19, 514 A.2d 1287 (citing State v. Butler, 27 N.J. 560, 602, 143 A.2d 530 (1958); State v. *27 Gambutti, 36 N.J.Super. at 223, 115 A.2d 136).
Our Supreme Court has said that "[t]he broad reliance on the discretion of the trial court and the standards governing individual competency determinations does not change when the proposed witness is youthful." Id. at 20, 514 A.2d 1287; see also State in the Interest of R.R., 79 N.J. 97, 112-13, 398 A.2d 76 (1979). The same rules apply in determining the competency of individuals afflicted by mental retardation or mental illness. See State v. Scherzer, 301 N.J.Super. at 463, 694 A.2d 196.
Applying these principles, we discern no sound basis to disturb the trial judge's decision. In reaching this conclusion, we have considered the fact that M.B. apparently fabricated rather freely in portions of his trial testimony. M.B. testified at some length to an imaginary conversation he allegedly had with T.A. at the Center's playground. Defendant emphasizes that this fictitious conversation evidenced M.B.'s inability to distinguish truth from fantasy. The fact remains, however, that both T.A. and M.B. were adjudged to be competent based upon substantial, credible evidence presented at the competency hearing. That M.B. subsequently fabricated an event that in fact did not occur was a matter for the jury's consideration.

IV.
We next consider whether the judge erred by joining the accusation with the indictment for the purpose of trial. It will be recalled that the accusation charged defendant with sexually abusing T.A., and the indictment charged defendant with sexually abusing M.B.
Our procedural rules provide that two or more indictments or accusations may be tried together if, among other things, the offenses charged "are of the same or similar character...." R. 3:7-6; R. 3:15-1(a). A judge may sever joined charges "[i]f for any reason it appears that a defendant or the State [may otherwise be] prejudiced...." R. 3:15-2. Because the offenses charged in the accusation and the indictment were of a "similar character" and thus satisfied the requisites of the Rule, they were properly joined. The question then is whether the judge should have granted defendant's motion for a severance based on prejudicial joinder.
Disposition of a motion for a severance pursuant to R. 3:15-2 is addressed to the sound discretion of the trial court. State v. Laws, 50 N.J. 159, 175, 233 A.2d 633 (1967), cert. denied, 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968); State v. Manney, 26 N.J. 362, 365, 140 A.2d 74 (1958); State v. Scioscia, 200 N.J.Super. 28, 42, 490 A.2d 327 (App.Div.1985); State v. Whipple, 156 N.J.Super. 46, 51, 383 A.2d 445 (App.Div.1978). Denial of such a motion will not be reversed in the absence of a clear showing of a mistaken exercise of discretion. State v. Rosenberg, 37 N.J.Super. 197, 202, 117 A.2d 168 (App.Div.1955).
Our courts have said that although separate and distinctive crimes which are the same or similar in character may be joined for the purpose of trial in the interests of judicial economy, where there exists a real "possibility of prejudice to [a] defendant, a trial severance of the offenses should be granted." State v. Reldan, 167 N.J.Super. 595, 597, 401 A.2d 563 (Law Div.1979), rev'd on other grounds, 185 N.J.Super. 494, 449 A.2d 1317 (App.Div.1982). A key factor in determining whether prejudice exists from joinder of multiple offenses "is whether the evidence of [those] other acts would be admissible in separate trials under [N.J.R.E. 404(b)]." State v. Moore, 113 N.J. 239, 274, 550 A.2d 117 (1988) (citing State v. Kent, 173 N.J.Super. 215, 220, 418 A.2d 1322 (App.Div.1980); *28 State v. Maddox, 153 N.J.Super. 201, 207, 379 A.2d 460 (App.Div.1977)); see also State v. Pitts, 116 N.J. 580, 601-02, 562 A.2d 1320 (1989). So posited, we focus our inquiry upon the issue whether the alleged offenses against T.A. would be admissible as evidence in a trial involving the alleged offenses against M.B. and vice versa.
Our evidentiary rules have historically prohibited admission of evidence of other crimes or wrongs except for limited purposes. Evidence Rule 55, the precursor to N.J.R.E. 404(b), barred the introduction of evidence of other crimes or civil wrongs when offered for the purpose of showing a person's disposition to prove that the person acted in conformity with that general propensity. That policy has been carried over into N.J.R.E. 404(b), which contains language identical to its federal counterpart. See Fed.R.Evid. 404(b). Our current rule provides:
Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

[N.J.R.E. 404(b).]
Our Supreme Court has characterized N.J.R.E. 404(b) as a "rule[ ] of exclusion" rather than one of "inclusion." State v. Nance, 148 N.J. 376, 386, 689 A.2d 1351 (1997); see also Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). The basic principle underlying the rule is that "courts should exclude evidence of other crimes, civil wrongs, or acts ... when such evidence is offered solely to establish the forbidden inference of propensity or predisposition." State v. Nance, 148 N.J. at 386, 689 A.2d 1351; see State v. Stevens, 115 N.J. 289, 299, 558 A.2d 833 (1989); State v. Kociolek, 23 N.J. 400, 418-20, 129 A.2d 417 (1957).
We stress that N.J.R.E. 404(b) does not bar other crime or civil wrong evidence in all instances. By its clear terms, the Rule permits admission of such evidence when relevant to prove some fact genuinely in issue. State v. Marrero, 148 N.J. 469, 482, 691 A.2d 293 (1997); State v. Oliver, 133 N.J. 141, 151-154, 627 A.2d 144 (1993); State v. Stevens, 115 N.J. at 300, 558 A.2d 833. Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue especially where the prosecution's access to significant information is limited. See Huddleston v. United States, 485 U.S. at 685, 108 S.Ct. at 1499, 99 L.Ed.2d at 780. Where such evidence tends to make the existence of a material fact "reasonably likely" it should be admitted if its probative worth outweighs its potential for causing confusion, undue consumption of time or improper prejudice. State v. Marrero, 148 N.J. at 482, 691 A.2d 293; see N.J.R.E. 403.
Our Supreme Court has adopted a four-part test in determining the admissibility of other crime or civil wrong evidence. State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992). Specifically, the evidence must be: (1) admissible as relevant to a material issue, (2) similar in kind and reasonably close in time to the act alleged, (3) clear and convincing, and (4) of sufficient probative value not to be outweighed by its apparent prejudice. Ibid. (citing Abraham P. Ordover, Balancing The Presumptions of Guilt and Innocence: Rules 404(b), 608(b), and 609(a), 38 Emory L.J. 135, 160 (1989) (footnote omitted)).
Our scope of review in addressing determinations on the admissibility *29 of other crime or civil wrong evidence is relatively narrow. We must review the record in light of the contention advanced, but not initially from the point of view of how we would decide the matter if we were the court of first instance. The Supreme Court has emphasized that "[t]he trial court, because of its intimate knowledge of the case, is in the best position to engage in [the] balancing process" required. State v. Ramseur, 106 N.J. 123, 266, 524 A.2d 188 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); see also State v. Nance, 148 N.J. at 387-88, 689 A.2d 1351; State v. Marrero, 148 N.J. at 483-84, 691 A.2d 293; State v. DiFrisco, 137 N.J. 434, 496-97, 645 A.2d 734 (1994), cert. denied, 516 U.S. 1129, 116 S.Ct. 949, 133 L.Ed.2d 873 (1996). "Only where there is a `clear error of judgment' should the `trial court's conclusion with respect to that balancing test' be disturbed." State v. Marrero, 148 N.J. at 483, 691 A.2d 293 (quoting State v. DiFrisco, 137 N.J. at 496-97, 645 A.2d 734).
These principles have particular pertinence here where we are reviewing a trial transcript consisting of thousands of pages and an equally extensive record of motion hearings. We recognize that a witness's manner may negate the thrust of his printed word, just as it may supply corroboration the record will not show. We are obliged to accord deference to the determinations of the trial court that are substantially influenced by its opportunity to hear and see the witnesses and to have the "feel" of the case which we, as reviewing judges, cannot enjoy. So viewed, we cannot say that the "trial court's ruling `was so wide of the mark that a manifest denial of justice resulted.'" State v. Marrero, 148 N.J. at 484, 691 A.2d 293 (quoting State v. Kelly, 97 N.J. 178, 216, 478 A.2d 364 (1984)).
Within this analytical framework, the trial judge could reasonably have concluded that the offenses against both alleged victims were relevant to a material issue in dispute, i.e., defendant's opportunity to commit acts of sexual abuse in his office. Our Supreme Court's decision in State v. Oliver, 133 N.J. 141, 627 A.2d 144 (1993) is controlling. There, the State claimed that the defendant at various times sexually assaulted four females in his third-floor bedroom of his parents home while other family members were downstairs. The Court held that the sexual assault charges were properly joined because all of the offenses would have been admitted as evidence at a single trial. Id. at 153, 627 A.2d 144. The Court reasoned that "the other-crime evidence would be admissible to show the feasibility of the proposition that defendant could sexually assault women in his room without other household members hearing or seeing anything unusual." Ibid. The Court observed, "[t]hat question was clearly a genuine issue in the case, inasmuch as the defense introduced the testimony of various household members that they had not heard any fighting or screaming on the evenings of the alleged assaults." Ibid.
The facts of this case are similar. The offenses were allegedly committed in defendant's office which was situated in a public area of the school. The defense presented numerous witnesses who testified with respect to the accessibility of that office and the ability of those traveling the hallway to have an unobscured view into the room. The feasibility of defendant committing the offenses was one of the critical factual issues. Moreover, the offenses committed were similar in kind and reasonably proximate in time. Plainly, the other-crime evidence had sufficient probative value not to be outweighed by its potential for undue prejudice. And surely, there was clear and convincing evidence *30 offered to establish the "other crimes." We conclude that the foundational requisites for admission of the evidence were satisfied.
Once the proponent has demonstrated the admissibility of other crime or civil wrong evidence and the court has engaged in the balancing process we have described, the jury must be instructed on the limited use of the proofs actually presented. In the context of criminal trials, our Supreme Court has explained that because "the inherently prejudicial nature of such evidence casts doubt on a jury's ability to follow even the most precise limiting instruction," State v. Stevens, 115 N.J. at 309, 558 A.2d 833, the instructions should be formulated carefully to enable the jury to comprehend the fine distinction to which it is required to adhere. State v. Cofield, 127 N.J. at 341, 605 A.2d 230. The trial court "should state specifically the purposes for which the evidence may be considered and, to the extent necessary for the jury's understanding, the issues on which such evidence is not to be considered." State v. Stevens, 115 N.J. at 309, 558 A.2d 833.
The judge's instructions in this case did not meet the required standard. The judge charged as follows:
Now there are various offenses in these two different charges against the defendant. I've read them to you. And they're separate offenses by separate counts in these two different charges. The defendant is entitled to have his guilt or innocence separately considered on each count by the evidence which is relevant and material to that particular charge based on the law as I will give it to you.
In other words, if you find the defendant guilty, say you're considering the charges alleged by [T.A.], and you find the defendant guilty of the first question. That doesn't necessarily mean he's guilty of the second and the third.
And by the same token, if you find him not guilty of the first question, that doesn't necessarily mean he is not guilty as to the second and third charge. And the same goes with regard to the allegations of [M.B.]. You treat each charge as to each boy separately. You treat each count as to each boy separately because they're different counts.

[Emphasis added.]
The charge as given did not specifically tell the jury that it could not consider the other-crime evidence to determine that the defendant was predisposed to commit the crimes charged. Nor did the instructions narrowly focus the jury's attention on the specific use of the other-crime evidence.
We stress, however, that no limiting instruction was requested. It is fundamental in our practice that a claim of error which could have been but was not raised at trial will not be dealt with as would a timely challenge. The reasons are several. It is certainly possible that in the context of the entire trial, the failure to object signifies that the error belatedly claimed was actually of no moment. Moreover, to rerun a trial when the mistake could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal. We do not deem it a palliative to explore the thoughts of trial counsel or his pertinent conversations with his now unhappy client. Such inquiries tend to demean the attorney-client relationship with no compensating gain. State v. Macon, 57 N.J. 325, 333, 273 A.2d 1 (1971).
It is certainly arguable that, unlike most cases, defendant here had little to gain and much to lose by requesting a limiting instruction. The charge given by the judge clearly conveyed the principle that the jury *31 was prohibited from considering the cumulative impact of the evidence of all the offenses in determining whether a particular charge had been proven. That was the thrust of the instruction to consider each charge separately. The jury faithfully complied with that instruction, acquitting the defendant of one of the charges. See State v. Moore, 113 N.J. at 276, 550 A.2d 117; State v. Manney, 26 N.J. at 366, 140 A.2d 74; State v. Scioscia, 200 N.J.Super. at 40-43, 490 A.2d 327. Thus, we discern little or no danger that the jury considered the other-crime evidence to find a general propensity on the part of defendant to commit sexual assaults.
An appropriate instruction would have apprised the jury of its right to consider the other-crime evidence in determining the feasibility of the proposition that defendant could sexually assault students in his office without being detected. Even from the prism of afterthought, it is doubtful that such an instruction would have aided the defendant's case, particularly when considered in the light of the charge actually given which conveyed the message that other-crime evidence could not be used for any purpose.
In these circumstances, we cannot fairly say that the error committed was capable of producing an unjust result. R. 2:10-2. Nor can we fairly say that the failure to request a limiting instruction was anything but a well reasoned strategic determination. Plain error was not committed.

V.
Defendant's remaining arguments clearly lack merit and do not require extended discussion. R. 2:11-3(e)(2). We offer the following brief comments.
We reject defendant's contention that the grand jury proceedings were tainted. Defendant asserts that the indictment should have been dismissed because the State presented false testimony on the issue of whether M.B. had previously made false allegations of sexual abuse against his cousin Joseph. Defendant also contends that Detective Mason commented on his exercise of his constitutional right to counsel. We need not describe the convoluted facts pertaining to these contentions. Suffice it to say, if mistakes were made, they were innocent ones, and clearly were not so serious as to warrant the draconian remedy of dismissal of the indictment. See State v. Hogan, 144 N.J. 216, 228, 676 A.2d 533 (1996); State v. Perry, 124 N.J. 128, 168-69, 590 A.2d 624 (1991); State v. Long, 119 N.J. 439, 478, 575 A.2d 435 (1990); State v. Wein, 80 N.J. 491, 501, 404 A.2d 302 (1979).
We also are unpersuaded by defendant's claim that the alleged victims' out-of-court statements were erroneously admitted. Various witnesses testified with respect to the circumstances surrounding the alleged victims' reports of the incidents. No details were elicited by the State. Defendant's attorney delved into this subject to a much greater extent than the prosecutor in order to demonstrate that the accounts of T.A. and M.B. were unreliable. We perceive no error, far less plain or invited error.

VI.
While we find some of the trial court's decisions on the application of the merger doctrine somewhat problematical, we have no occasion to address the issue further. The State did not object below. Its cross-appeal was not filed in a timely manner. The issues are wholly academic because the overall sentence would be the same even if we were to intervene and give credit to the State's contentions.
Affirmed.
NOTES
[1] For purposes of consistency, we refer to Carol Ruth as "Aunt Carol" throughout the recitation of facts.
[2] Out of the jury's presence, defendant presented evidence indicating that he had been charged with similar criminal offenses in 1986, and had been acquitted. Specifically, a Monmouth County jury found defendant not guilty of aggravated sexual assault, sexual assault and child endangerment. The facts alleged in the earlier case were said to be the mirror image of those alleged by the prosecution in this case. Defendant contended that the victims' families were predisposed to believe him capable of sexually abusing students under his care because of their knowledge of the prior charges. He asserted that the victims' families consciously or subconsciously communicated that bias against him while questioning T.A. and M.B. No direct evidence of such a predisposition was presented, and the judge made no specific finding on this point.
[3] The State's experts did not videotape or audiotape their interviews with the alleged victims, apparently because they believed that use of such equipment could create needless anxiety and distort the results.
[4] At defendant's behest, several psychologists moved to appear in the role of amicus curiae, contending in their brief that Hall's methodology and conclusions were incorrect and invalid. Another panel of this court denied that application on the ground that it would be unjust to permit the defense to supplement the record without affording the prosecution a similar opportunity. We note that defense counsel was granted great latitude in cross-examining both Witt and Hall and in presenting evidence attacking the validity of their opinions. We are content to decide the issue presented based upon the evidence that appears in the record.