**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3476-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

B.K.K.,

     Defendant-Appellant.

_____

Argued January 21, 2020 – Decided June 17, 2020

Before Judges Rothstadt and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Indictment No. 14-10-0307.

Scott M. Welfel, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Tamar Yael Lerer, Assistant Deputy Public Defender, of counsel and on the briefs).

Jeffrey L. Weinstein, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Michael J. Williams, Acting Hunterdon County Prosecutor, attorney; Jeffrey L. Weinstein, of counsel and on the brief).

PER CURIAM

Defendant B.K.K.[1] appeals from the Law Division's March 20, 2017 judgment of conviction that was entered after a jury found him guilty of three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) and (2)(c), five counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b), (c)(1) and (c)(4), and two counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a). In reaching its verdict, the jury found defendant sexually assaulted his two minor stepdaughters, J.R. and K.R., beginning in approximately 2013, when they were 12 and 10 years old respectively.[2] The trial court sentenced defendant to an aggregate term of forty-five years, subject to a mandatory period of parole ineligibility under N.J.S.A. 2C:14-2(a) and the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

On appeal, defendant argues: (1) that testimony from his niece, whom he allegedly sexually assaulted as early as 2003, was improperly admitted under N.J.R.E. 404(b); (2) expert testimony about the Child Sexual Abuse and

---

[1]  We use initials to protect the privacy of the children and members of the family. R. 1:38-3(c)(9).

[2]  Although defendant and the victim's mother participated in a religious ceremony, they were never legally married. However, it was undisputed that the victims and the family considered defendant their stepfather.

Accommodation Syndrome (CSAAS) was improperly admitted in light of the Court's holding in State v. J.L.G., 234 N.J. 265 (2018); and (3) defendant's sentence was excessive. For the reasons that follow, we affirm.

## I.

In 2013, J.R. and K.R. lived with defendant, their mother, their brother, and defendant's son. According to J.R., she was watching television late one evening while her mother, sister, and brother were in the house sleeping, when defendant sat next to her on the couch. Defendant then put his hands down J.R.'s pants, and digitally penetrated her vagina while he masturbated. J.R. stated this went on for about twenty or twenty-five minutes. She never told anyone about that incident at the time because defendant told her he would go to jail if she told anyone what happened, she knew defendant made her mother happy, and she was afraid her family would be ruined if she disclosed.

J.R. recalled two other instances when defendant sexually assaulted her. Once while she was lying on the couch late at night, half asleep, defendant walked in, sat next to her, and turned her over onto her back. J.R. attempted to resist, but defendant would not stop. He removed her pants and her underwear, and performed an act of cunnilingus. On another occasion in the middle of the afternoon, defendant unzipped J.R.'s jeans while she was laying on the couch

and digitally penetrated her vagina. Defendant committed that assault while J.R.'s brother was in the same room, but had his back turned and his headphones over his head.

After this last incident, J.R. texted her mother and her thirteen-year-old friend, disclosing that defendant assaulted her. Her mother walked into her room crying and after J.R. explained what happened, her mother told her that defendant would not do that. J.R.'s mother told her that their family would be broken up if J.R. repeated her allegation.

After J.R. got home from school the next day, she and her mother talked about J.R.'s accusation against defendant. Her mother told J.R. that defendant had taken a lie detector test, which revealed defendant was telling the truth. After about forty-five minutes of arguing back and forth, J.R. "gave up" and told her mother she had lied. Her mother then told J.R. that defendant never took a lie detector test.

Thereafter, on July 2, 2014, K.R. told J.R. that defendant had assaulted her. In response, J.R. revealed that defendant had done the same thing to her. J.R. also told K.R. how their mother did not believe J.R., which made K.R. believe it would be futile to tell their mother defendant had touched her.

4

K.R. texted her friend about what defendant had done, but told the friend not to tell anyone because she did not want to live with her father again, did not want her family to break apart, and because J.R. told her not to tell anyone. The friend showed K.R.'s text messages to her sister, and then her mother. The friend's mother called 9-1-1.

According to Detective Donna Snyder of the Hunterdon County Prosecutor's Office, she received a phone call on July 3, 2014 that J.R. and K.R. had been sexually assaulted. Thereafter, arrangements were made for the two girls to be taken to the prosecutor's office by their grandmother. When K.R. learned that she was going to the prosecutor's office, she stopped home, where defendant allegedly told her that he was sorry and it would not happen again.

The children were brought from the prosecutor's office to the Child Advocacy Center, where Snyder interviewed them. As part of this interview, K.R. disclosed that on July 2, 2014, defendant touched her vaginal area. J.R. stated that defendant had abused her several times beginning in the summer of 2012. According to Detective Snyder, J.R. first disclosed her abuse to a close girlfriend, and then to her mother. Her mother did not believe J.R. and wanted J.R. to take a polygraph examination to determine whether J.R. was lying.

Defendant voluntarily appeared for an interview at the prosecutor's office on July 3, 2014. Defendant denied his stepdaughters' allegations. He admitted that he massaged his stepdaughters frequently, but understood how others could think it was strange.

Defendant was arrested and charged with various offenses relating to his alleged sexual assault of his stepdaughters. On October 30, 2014, a Hunterdon County Grand Jury returned an indictment charging defendant with: two counts of first-degree aggravated sexual assault contrary to N.J.S.A. 2C:14-2(a)(1); one count of first-degree aggravated sexual assault contrary to N.J.S.A. 2C:14-2(a)(2)(c); two counts of second-degree sexual assault contrary to N.J.S.A. 2C:14-2(b); two counts of second-degree sexual assault contrary to N.J.S.A. 2C:14-2(c)(1); one count of second-degree sexual assault contrary to N.J.S.A. 2C:14-2(c)(4); and two counts of endangering the welfare of a child contrary to N.J.S.A. 2C:24-4(a).

Prior to his trial, the court addressed several motions filed by defendant and the State. One motion led to a hearing on the suppression of defendant's pretrial statement to law enforcement, which the trial court denied. The State filed a motion to introduce testimony from B.G., defendant's niece, about defendant having sexually assaulted her from when she was eleven until she was

eighteen under N.J.R.E. 404(b).  On August 2, 2016, the trial court conducted a Rule 104 hearing, heard testimony from B.G., and on August 16, 2016, the court entered an order denying the State's motion to admit evidence of defendant's sexual assault of B.G. in its case-in-chief under N.J.R.E. 404(b).  However, the court reserved its determination about whether the State could admit such evidence "if and when a material issue in dispute [was] raised which opens the door to permissible rebuttal evidence."

On November 15, 2016, the trial judge considered the State's motion to admit expert testimony from Dr. Vincent D'Urso, an authority on CSAAS.  After conducting a Rule 104 hearing, the court granted the motion.

During defendant's ensuing trial, J.R. testified to the above assaults and to two more occasions where defendant sexually abused her by digitally penetrating her—including one instance where others were present in the home. J.R. also stated she did not call for her mother when she was being assaulted because she felt she would not have done anything.  In addition, J.R. testified that while she was being interviewed by a detective at the prosecutor's office, her mother was sending her text messages inquiring about her answers to the detective's questions and reminding her that defendant would go to jail and their family would be broken up.

A-3476-16T4

K.R. also testified at trial. She described the one time that defendant assaulted her. She explained that it occurred when everyone was home but engaged in their own activities. According to K.R., she was sitting on the couch when defendant sat next to her and began massaging her back. He gradually moved his hands down her back and then inside her pants when he started touching her vagina before digitally penetrating her.

On cross examination, defendant challenged J.R.'s and K.R.'s testimony by questioning whether it was fabricated in accordance with instructions from their father. Moreover, the two victims were questioned about how defendant could have committed the crimes they alleged while other family members were present in the room or house.

The victims' mother, defendant's wife, testified at trial for the State.[3] She explained the relationship between her, defendant, and her former husband. She believed her daughters were being influenced by their father when they made the allegations against defendant. She confirmed at trial however, that at her plea hearing she testified that she believed that defendant had assaulted her

---

[3] Before defendant's trial, the victims' mother pled guilty to charges of child abuse, child endangerment, and witness tampering in connection with this matter. She faced up to nineteen years in prison, but under a plea agreement the State would recommend five years' probation if she testified truthfully at defendant's trial.

A-3476-16T4

daughters. The mother also testified to a phone call she received from defendant in which he told her he "fucked up," that he was sorry, and could not "help it."

The victims' brother testified at trial for defendant that "there was always somebody at the house." He stated that, contrary to J.R.'s testimony, he did not wear headphones when he was on the computer, which was located in the living room. He also testified that when he was on the computer and J.R. was on the couch, nothing inappropriate could have happened because he was in the same room.

Defendant also testified at trial. He stated that the two girls fabricated their testimony at their father's direction. According to defendant, there was "quite a bit" of animosity between him and his wife's ex-husband, who controlled J.R. and K.R. and who wanted defendant "out of the picture." When he was asked if he ever sexually assaulted J.R., defendant replied that he "never sexually assaulted anyone." He also denied assaulting K.R. Moreover, he denied that he was ever alone with them, but admitted to sometimes giving them massages. As to the phone call he made to his wife, he explained that it referred to his decision to not take a polygraph test when it was offered by the prosecutor.

Thereafter, the State renewed its Rule 404(b) motion to allow B.G to testify, arguing that defendant opened the door for her testimony's admission.

The court concluded that under Rule 404(b), B.G.'s testimony of the prior assaults against her was admissible to rebut defendant's claims of fabrication, vendetta, and lack of feasibility/opportunity and to rebut defendant's opening the door. The judge allowed the testimony, but ordered that it be "sanitized" so as to mitigate the prejudicial effect of the details of defendant's assault on B.G. that were not similar in nature to the assaults on J.R. and K.R.

After the defense rested, but before B.G. testified, the trial court delivered a limiting instruction to the jury about their use of B.G.'s testimony in their deliberations. B.G., who was then twenty-four years old, testified to defendant sexually assaulting her on several occasions beginning at the age of eleven, in 2003, until she was fourteen, while other family members were home, in a manner similar to what J.R. and K.R. described in their testimony. She also described how defendant told her not to tell anyone about what he was doing because he would be sent to jail. One incident she described occurred in a hotel room, while she was on a trip with defendant, his son, and her brother. In addition, B.G. explained that although she told friends what was happening to her, she did not tell her father until she learned that defendant was charged in this matter.

10

Defendant and his son testified in rebuttal to B.G.'s testimony. The son, who had gone on trips with his father and B.G., stated he never saw defendant assault B.G. or heard anyone else state that defendant had done so. Defendant denied sexually assaulting B.G. He explained that after B.G. turned eighteen, she moved in with defendant because her parents were moving to Las Vegas and she did not want to go with them. Defendant testified that he had sex with B.G. two or three times after she turned eighteen. However, on cross-examination, when defendant was confronted with the transcript of a phone call[4] between him and his mother, he recalled his mother asking about B.G.'s age, which was eleven at that time, and admitted that he thought the two of them were in a relationship at that time.

On December 7, 2016, the jury convicted defendant on all counts of the indictment. The trial court sentenced defendant on March 10, 2017. This appeal followed.

On appeal, defendant argues the following:

POINT I

EVIDENCE OF ENTIRELY UNRELATED ALLEGATIONS AGAINST DEFENDANT SHOULD NOT HAVE BEEN ADMITTED BECAUSE IT

---

[4] The judge provided a limiting instruction to the jury that this transcript was only to be used for the purpose of considering defendant's credibility.

SERVED ONLY AS PROHIBITED PROPENSITY EVIDENCE. THE ADMISSION OF THIS UNDULY PREJUDICIAL EVIDENCE NECESSITATES REVERSAL OF DEFENDANT'S CONVICTIONS.

. . . .

B. THE EVIDENCE OF PRIOR BAD ACTS SERVED ONLY TO DEPICT DEFENDANT AS HAVING BAD CHARACTER AND CRIMINAL PROPENSITIES. ITS ERRONEOUS ADMISSION NECESSITATES REVERSAL OF HIS CONVICTIONS.

POINT II

TESTIMONY ABOUT [CSAAS] WAS NOT BASED ON RELIABLE SCIENCE, WAS IRRELEVANT, AND WAS UNDULY PREJUDICIAL. ITS ADMISSION NECESSITATES REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT III

DEFENDANT'S SENTENCE IS EXCESSIVE.

We are not persuaded by defendant's arguments about the admission of B.G.'s testimony or his sentence. As to the CSAAS testimony, we agree that it should not have been admitted, but we also conclude the error was harmless. Finally, we find no merit to defendant's argument about his sentence.

II.

12                                                    A-3476-16T4

We begin our review by addressing defendant's argument that the trial court erred by admitting B.G.'s testimony under Rule 404(b). We disagree.

## A.

According to the trial court's written decision issued in response to the State's N.J.R.E. 404(b) pretrial motion to admit B.G.'s testimony, the court applied the four-factor test articulated in State v. Cofield, 127 N.J. 328 (1992), and found that while B.G.'s testimony could not be offered as direct evidence, it could be used on rebuttal if defendant opened the door. The trial court barred the testimony because although the evidence satisfied the first three Cofield factors, the court concluded under the last factor that the testimony's probative value as direct evidence would only be to bolster the credibility of the victims, which was not permitted. Additionally, the evidence of B.G.'s sexual assault was highly prejudicial to defendant. The court stated that while the evidence of B.G.'s sexual assault was inadmissible in the State's case-in-chief, it was reserving its determination as to whether it could be presented on rebuttal, should defendant "open the door."

Before later permitting the challenged testimony on rebuttal, the trial court issued a nineteen-page comprehensive written decision setting forth its reasons. In its decision, the court re-analyzed the Cofield factors. In its consideration of

the first factor, after conducting a lengthy discussion of the applicable law, the trial court relied upon our opinion in State v. Krivacska, 341 N.J. Super. 1 (App. Div. 2001), and the Court's opinion in State v. Oliver, 133 N.J. 141 (1993). The trial court found that the proposed evidence of B.G.'s sexual assault was admissible to rebut defendant's claims that J.R. and K.R. were fabricating their stories, and that defendant lacked the opportunity or it was not feasible to have committed the crimes. According to the court, defendant placed those issues in question by cross-examining J.R. and K.R. as well as calling witnesses who were in the vicinity of the alleged assaults.

As to the second factor, the judge reaffirmed her earlier decision and stated the assaults of the three girls were similar in kind given how close in age each victim was, defendant's relationship to the girls, and the warnings that defendant gave each victim about what would happen to him if any of them disclosed his behavior. As to the third factor, the judge found B.G.'s testimony supplied clear and convincing evidence of the bad act because her testimony was consistent, she was detailed and specific, and her testimony was straightforward.

Last, the judge found that the probative value of B.G.'s testimony was no longer outweighed by its prejudicial effect as it was probative of issues defendant placed in dispute. Nevertheless, the court directed that B.G.'s

testimony had to be "sanitized" to lessen its potential prejudicial effect. The court would not allow the State to introduce testimony that defendant's assaults on B.G. lasted for seven years or occurred beyond B.G. being fourteen years old or included allegations of sexual intercourse.

Prior to B.G.'s testimony, and afterward in its final charge, the trial court delivered a limiting instruction as to how and to what extent the jury was to consider B.G.'s testimony. In the charge, the court informed the jury that B.G.'s testimony could not be used to prove that defendant had sexually assaulted J.R. or K.R. Rather, it could only be used to rebut defendant's claims that the girls fabricated their allegations or that there was no opportunity for him to sexually assault either of them. The trial court informed the jury:

> [Y]ou may not use this evidence to decide that the defendant has a tendency to commit crimes or that he is a bad person. That is, you may not decide that just because the defendant has committed other crimes, wrongs or acts, he must be guilty of the present crimes. I have admitted the evidence only to help you to decide with specific questions of fabrication and opportunity, access or feasibility. You may not consider it for any other purpose and may not find the defendant guilty now simply because the State has offered evidence that he committed other crimes, wrongs or acts.

Defendant never raised an objection to any of the trial court's charges in this regard.

B.

We apply a deferential standard of review to a trial court's admission of Rule 404(b) evidence. Generally, "[a] trial court's ruling on the admissibility of evidence is reviewed on appeal for abuse of discretion." State v. Rose, 206 N.J. 141, 157 (2011). "The admission or exclusion of evidence at trial rests in the sound discretion of the trial court." State v. Willis, 225 N.J. 85, 96 (2016).

"When specifically reviewing the sensitive admissibility rulings made pursuant to the weighing process demanded by Rule 404(b)," Rose, 206 N.J. at 157, we give "great deference" to a trial court's determination on the admissibility of "other bad conduct" evidence, State v. Goodman, 415 N.J. Super. 210, 228 (App. Div. 2010) (quoting State v. Foglia, 415 N.J. Super. 106, 122 (App. Div. 2010)). "The admissibility of such evidence is left to the sound discretion of the trial court, as that court is in the best position to conduct the balancing required under Cofield due to its 'intimate knowledge of the case.'" State v. Gillispie, 208 N.J. 59, 84 (2011) (quoting State v. Covell, 157 N.J. 554, 564 (1999)).

While we apply an abuse of discretion standard, requiring a "clear error of judgment" to overturn the trial court's determination, State v. Castagna, 400 N.J. Super. 164, 183 (App. Div. 2008), "[t]hat discretion is not unbounded.

Rather, it is guided by legal principles governing the admissibility of evidence which have been crafted to assure that jurors receive relevant and reliable evidence to permit them to perform their fact-finding function and that all parties receive a fair trial." Willis, 225 N.J. at 96.

N.J.R.E. 404(b) provides that evidence of other crimes or bad acts is generally not admissible, unless used for "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." The concern in admitting evidence of other crimes or bad acts is "the jury may convict the defendant because he is 'a "bad" person in general.'" Cofield, 127 N.J. at 336 (quoting State v. Gibbons, 105 N.J. 67, 77 (1987)). The burden of proving that N.J.R.E. 404(b) evidence should be admitted falls on the moving party seeking to admit such evidence. State v. Reddish, 181 N.J. 553, 608-09 (2004).

In Cofield, our Supreme Court set forth a four-pronged test to govern the admission of such evidence:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[Cofield, 127 N.J. at 338 (quoting Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b), and 609(a), 38 Emory L.J. 135, 160 (1989) (footnote omitted)); see also State v. Carlucci, 217 N.J. 129, 140-41 (2014) (reaffirming the Cofield test).]

Generally, all four Cofield factors must support the admission of the evidence in question. State v. P.S., 202 N.J. 232, 255 (2010). However, "other crimes evidence may be admissible if offered for any non-propensity purpose" if the trial court determines that it is relevant, and its probative value outweighs the potential prejudicial effect. Rose, 206 N.J. at 180-81; see also Cofield, 127 N.J. at 338. "The threshold determination . . . is whether the evidence relates to 'other crimes,' and thus is subject to . . . analysis under Rule 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly Rule 403." Rose, 206 N.J. at 179.

To determine if evidence "is intrinsic to the charged crime," the Court in Rose adopted a test enunciated in United States v. Green, 617 F.3d 233 (3d Cir. 2010). Rose, 206 N.J. at 180. The Court held that "two narrow categories of evidence" of other bad acts are intrinsic to the charged crime: (1) evidence that

18

"directly proves the charged" crime; and (2) evidence of bad "acts performed contemporaneously with the charged crime" that "facilitate[d] the commission of the charged crime." Ibid. (quoting Green, 617 F.3d at 248-49). Any evidence of other bad acts not fitting within one of those two "tight description[s] of intrinsic evidence" must be analyzed under Rule 404(b). Id. at 181.

A court is not limited to "the examples set forth in the rule concerning the permissible uses of other-crimes evidence [as they] 'are not intended to be exclusive.'" N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 572 (App. Div. 2010) (quoting State v. Nance, 148 N.J. 376, 386 (1997)). "To be sure, such evidence could be offered to negate accident; to establish motive, pattern, or design; or for a myriad of other legitimate reasons under the rule." P.S., 202 N.J. at 240.

By its clear terms, N.J.R.E. 404(b) permits admission of such evidence when relevant to prove some fact genuinely in issue. State v. Marrero, 148 N.J. 469, 482 (1997); Oliver, 133 N.J. at 151-54; State v. Stevens, 115 N.J. 289, 300 (1989). "Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue," especially where the prosecution's access to significant information is limited. Huddleston v. United States, 485 U.S. 681, 685 (1988). The evidence is not required to prove or disprove a fact at issue but need only

support a desired inference. State v. Swint, 328 N.J. Super. 236, 252-53 (App. Div. 2000).

"Where such evidence tends to make the existence of a material fact 'reasonably likely,' it should be admitted if its probative worth outweighs its potential for causing confusion, undue consumption of time or improper prejudice." Krivacska, 341 N.J. Super. at 39 (quoting Marrero, 148 N.J. at 482); see also N.J.R.E. 403. In State v. Garrison, 228 N.J. 182 (2017), the Court held that evidence of defendant's involvement in a game of strip poker with his victim was admissible since its probative value outweighed any prejudicial effect it might have had on defendant. Id. at 197-200. Moreover, the Court concluded that since evidence of the poker game was admissible under the "rigorous" N.J.R.E. 404(b) standard, it was not obligated to reach the State's argument that evidence of the poker game was intrinsic and thus only subject to N.J.R.E. 403. Id. at 201-02; see Rose, 206 N.J. at 178 ("It is therefore more likely that evidence of uncharged misconduct will be admitted into evidence if it is considered intrinsic to the charged crime and subject only to Rule 403 than if it is not considered intrinsic evidence and subject to both Rule 404(b) and Rule 403.").

Non-propensity evidence has been admitted specifically to establish that a defendant who committed a sexual assault could do so even though other

people were present.  For example, in Oliver, a case relied upon by the trial court

here, the defendant sexually assaulted his victims "while other family members

were downstairs; engaged in conversation with his victims; drank some beer;

and then resorted to brute force to cut off the victims' air supply until they

relented."  State v. Sterling, 215 N.J. 65, 99 (2013) (quoting Oliver, 133 N.J. at

145).  While the Court in Oliver rejected the use of evidence of one assault to

prove another, it

> noted that the same evidence may have been admissible
> to prove other facts in issue, namely, the feasibility that
> the defendant could assault a woman in his room
> without the other family members at home knowing and
> to show the success of the defendant's pretext to lure
> women to his room.
>
> [Ibid. (citing Oliver, 133 N.J. at 153).]

Similarly, in Krivacska, the other case relied upon by the trial court, we

concluded that other-crime evidence could be introduced to demonstrate

feasibility where "[t]he defense presented numerous witnesses who testified

with respect to the accessibility of that office [where the assaults occurred] and

the ability of those traveling the hallway to have an unobscured view into the

room.  The feasibility of defendant committing the offenses was one of the

critical factual issues."  Krivacska, 341 N.J. Super. at 41.  In that case, we held

the other-crime evidence would be admissible for that purpose after finding that

21

"the offenses committed were similar in kind and reasonably proximate in time. . . . [T]he other-crime evidence had sufficient probative value not to be outweighed by its potential for undue prejudice. And surely, there was clear and convincing evidence offered to establish the 'other crimes.'" Ibid.

In State v. Prall, 231 N.J. 567 (2018), the Court reviewed a trial court's admission of N.J.R.E. 404(b) evidence after initially barring its admission under Cofield, but allowing it when the defendant "opened the door" by challenging a victim's testimony about her "purported fear of defendant." Id. at 581-82. In its discussion of why the challenged evidence was not admissible under the facts of that case, the Court explained when such evidence is admissible in response to a defendant's tactics at trial. The Court stated the following:

> The "opening the door" doctrine is "a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection." State v. James, 144 N.J. 538, 554 (1996) (emphases omitted). In other words, it permits "a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence." Ibid. (citation omitted). The "doctrine operates to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context."

22

> Ibid. The doctrine is limited, however, by weighing the probative value against the prejudicial nature of the evidence under N.J.R.E. 403. Ibid.
>
> [Id. at 582-83.]

The Court emphasized that the admission of such evidence cannot be intended "to bolster" another witness's testimony. Id. at 583. In any event, "the probative value of that testimony would nevertheless need to outweigh its apparent prejudice," ibid., and be "relevant to a material issue," id. at 584 (quoting State v. Sanchez-Medina, 231 N.J. 452, 465 (2018)).

In P.S., the Court made clear such evidence cannot be admitted simply to bolster a witness' testimony. There the Court concluded "that a defendant's invocation of the so-called vendetta defense does not permit the prosecutor to bolster the credibility of a sex abuse victim by adducing evidence of another molestation." P.S., 202 N.J. at 240. In that case, the State had proffered evidence of defendant's molestation of a three-year-old boy, years earlier, to both refute defendant's contention that the instant victim, an eleven-year-old girl, had fabricated her allegations due to bias and to bolster her credibility. Id. at 257-61. Unlike the present case, "what was proffered was an unrelated sex crime, which was only linked to the bias of the State's witnesses by the notion

that if defendant did it before, he likely did it again, thus supporting the credibility of [the victim and her mother]." Id. at 259.

In State v. G.V., 162 N.J. 252 (2000), the Court considered whether evidence of the previous molestation of an older daughter by her father was admissible as other-crime evidence in his trial for committing sexual assault against his younger daughter. Id. at 256. Both the older daughter and the younger daughter alleged similar events, including what age the molestation began, how the intercourse began, and the fact that the intercourse always occurred while their mother was working. Ibid. The Court recognized that such other-crime evidence could be admissible to prove feasibility or access and could be used to refute a contention that the victims were biased against the defendant. Id. at 264-65.

Here, B.G.'s, K.R.'s, and J.R.'s testimony all described the manner in which defendant would touch them, how defendant told them all not to disclose any of his behavior, and how defendant would touch them while others were nearby. B.G.'s testimony was admitted in response to issues raised by defendant as to fabrication and feasibility, and to his opening the door to not having committed other sexual assaults. Under these circumstances, the trial court properly determined that B.G.'s testimony met the requirements for admissibility

24

as contemplated by the Court and not merely to bolster defendants' victims' testimony.

Once a trial court deems the non-propensity evidence admissible, it must give the jury limiting instructions as to how the bad-conduct evidence can be considered. Garrison, 228 N.J. at 200-01. "[I]n order to minimize 'the inherent prejudice in the admission of other-crimes evidence, our courts require the trial court to sanitize the evidence when appropriate.'" Rose, 206 N.J. at 161 (quoting State v. Barden, 195 N.J. 375, 390 (2008)). The trial court here delivered the required instructions.

We discern no abuse in the trial court's discretion of its admission of B.G.'s testimony. We affirm that determination substantially for the reasons expressed by the trial court in its thoughtful written decision. We add the following brief comments.

Here, the trial court initially barred B.G.'s testimony under Cofield's fourth factor, but later allowed it as non-propensity evidence after defendant took the stand and testified that he never assaulted anyone, knowing that B.G.'s testimony had already been barred and the State, without leave, could not rebut his claim. The admission of the testimony was valid for that reason, as the State was without any other proof that his claim was untrue and because defendant

25

repeatedly raised an issue with the jury that he could not commit the charged crimes since there was always other people present in the home. Evidence that he successfully committed a similar crime, under similar circumstances, was permitted as long as it was, as here, accompanied by the appropriate instruction to the jury and sanitized. We "assume[ the jury] follow[ed] the instruction and use[d] the information for the limited purpose . . . and not for propensity." State v. Outland, 458 N.J. Super. 357, 372-73 (App. Div.) (citing State v. Marshall, 173 N.J. 343, 355 (2002)), certif. denied, 239 N.J. 503 (2019).

III.

We turn next to defendant's contention that the admission of expert testimony about CSAAS, over defendant's objection, was improper. We agree, but find the error to be harmless.

A.

At trial, Dr. D'Urso was qualified as an expert witness on CSAAS and testified consistent with his pretrial testimony at the Rule 104 hearing. Dr. D'Urso explained the five characteristics of CSAAS as well as delayed disclosure, stating there was no credible study in the world that had concluded children disclosed their abuse after the first incident of abuse. When Dr. D'Urso was presented with a hypothetical about a child who disclosed sexual abuse to

26

an adult, where the adult did not believe the child, he testified that such a situation could foster delayed disclosure, recantation, or it could result in the child disclosing the abuse, but then never discussed it again in his testimony.

Prior to Dr. D'Urso's testimony, and later in its final instructions, the trial court instructed the jury, in accordance with the Model Jury Charges, that it could not consider the doctor's testimony for the purpose of determining whether defendant sexually assaulted J.R. and K.R. The court instructed that the expert testimony about CSAAS was to be used, not as a diagnostic device, but for purposes of providing them with general knowledge about delayed disclosure and to explain behavior of children who were sexually abused. Further, the court instructed the jurors that they "may or may not conclude that [the victims'] testimony is untruthful based only [on J.R.'s and K.R.'s] silence and delayed disclosure." Finally, the court instructed the jury it "may not consider that [expert] testimony as proving in and of itself that J.R. or K.R., . . . were or were not truthful."

## B.

CSAAS is a syndrome "identified [by] five categories of behavior that were reportedly common in victims of child sexual abuse: secrecy; helplessness; entrapment and accommodation; delayed, conflicted,

unconvincing disclosure; and retraction." J.L.G., 234 N.J. at 271. "Courts across the nation" had allowed "experts to testify about the syndrome in criminal sex abuse trials. In 1993, th[e] Court found that CSAAS evidence was sufficiently reliable to be admitted." Ibid.

During the pendency of this appeal, our Supreme Court issued its opinion in J.L.G., which partially overturned its earlier holdings that permitted expert testimony about CSAAS. In J.L.G., the Court stated the following:

> Based on what is known today, it is no longer possible to conclude that CSAAS has a sufficiently reliable basis in science to be the subject of expert testimony. We find continued scientific support for only one aspect of the theory—delayed disclosure—because scientists generally accept that a significant percentage of children delay reporting sexual abuse.
>
> We therefore hold that expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials. Evidence about delayed disclosure can be presented if it satisfies all parts of the applicable evidence rule. In particular, the State must show that the evidence is beyond the understanding of the average juror.
>
> [Id. at 272 (citation omitted).]

The J.L.G. Court noted that admissibility of CSAAS expert testimony on the delayed disclosure aspect of the syndrome "will turn on the facts of each case." Ibid. When a victim gives "straightforward reasons about why [he or]

she delayed reporting abuse, the jury [does] not need help from an expert to evaluate [his or] her explanation. However, if a child cannot offer a rational explanation, expert testimony may help the jury understand the witness's behavior." Ibid.

J.L.G. permits expert testimony about delayed disclosure or causes for delayed disclosure. However, "[t]he testimony should not stray from explaining that delayed disclosure commonly occurs among victims of child sexual abuse, and offering a basis for that conclusion." Id. at 303. For example, we have found, under J.L.G., it is improper for a CSAAS expert to testify that the five CSAAS categories of behavior "may be behaviors exhibited by a truthful child sex abuse victim." State v. G.E.P., 458 N.J. Super. 436, 450 (App. Div.), certif. granted, 239 N.J. 598 (2019). However, even if improperly admitted, admissibility of CSAAS expert testimony may be harmless "in light of the overwhelming evidence of [a] defendant's guilt." J.L.G., 234 N.J. at 306.

Although the Court in J.L.G. did not indicate whether its holding applied retroactively, in G.E.P., we concluded that the holding "should be given at least pipeline retroactivity," rendering it applicable to all cases in which the parties have not exhausted all avenues of direct review when the Court issued its opinion. G.E.P., 458 N.J. Super. at 448. We therefore conclude here that the

Court's holding in J.L.G. is applicable to defendant as his appeal was pending when J.L.G. was decided.

Turning to defendant's argument, we initially note that this was not a case that turned on either victims' failure to report abuse. K.R. disclosed to J.R., and a friend, the one time she was victimized and explained she did not tell her mother because J.R. told her their mother would not believe her. J.R. explained she did not disclose her abuse because defendant told her he would go to jail, that her mother would not believe her, and that it would harm or break up the family. These explanations were not beyond the ken of an average juror. See J.L.G., 234 N.J. at 305 ("[A] young teenager's explanation from the witness stand may fall within the ken of the average juror and might be assessed without expert testimony."). Even if either victim had not provided an explanation, Dr. D'Urso's testimony strayed beyond the limits of "explaining that delayed disclosure commonly occurs among victims of child sexual abuse, and offering a basis for that conclusion." Id. at 303. Not only did Dr. D'Urso testify in detail about the five categories of CSAAS behavior, separate from delayed disclosure and its causes, he testified that children often exhibit "piecemeal disclosure," wherein they disclose different elements of the abuse to different professionals depending on a given professional's role. Moreover, Dr. D'Urso testified as to

why a child would disclose their abuse after the first incident of abuse, stating that "[s]ome kids are better at self-protection than others."

While we conclude it was an error to admit the CSAAS testimony, we find the error to have been harmless. "An error is harmless unless, in light of the record as a whole, there is a 'possibility that it led to an unjust verdict'—that is, a possibility 'sufficient to raise a reasonable doubt' that 'the error led the jury to a result it otherwise might not have reached.'" Id. at 306 (quoting State v. Macon, 57 N.J. 325, 335-36 (1971)).

Our conclusion is based upon the overwhelming evidence of defendant's guilt considered by the jury before reaching its verdict. J.R., K.R., and defendant all testified that he would sit on the couch with them while they would watch television. Defendant stated he would give the girls massages all the time. He stated he would massage them in tender areas, such as their lower back, hip, and thigh. K.R. testified that before the girls left for the prosecutor's office, defendant told her he was sorry and that "it won't happen again." Both J.R. and K.R. testified that defendant told them not to disclose their abuse because any disclosure would destroy their family dynamic. J.R. testified that she was digitally penetrated on multiple occasions after she had been abused numerous times throughout the summer 2012. She testified that she did not want to

31

disclose her abuse to her mother because she was afraid her mother would not believe her and knew that defendant made her mother happy. Moreover, B.G.'s testimony about defendant touching her while other people were home, in the same fashion he did with K.R. and J.R., and telling her why she should not disclose to others, rebutted defendant's testimony that he never assaulted anyone and that he could not have committed the crimes because other people were in the house.

Under these circumstances, the admission of the CSAAS testimony was an error, we find no harmful error warranting a reversal of defendant's conviction.

IV.

Finally, we consider defendant's argument that his sentence to an aggregate custodial term of forty-five years with a minimum of thirty-seven years, fifteen months, and five days of parole ineligibility was excessive as he was a first-time offender. We find no merit to this contention.

A.

At sentencing, the trial court considered the statutory aggravating and mitigating factors before imposing sentences on each count. The court stated aggravating factor one, the "nature and circumstances of the offense," N.J.S.A. 2C:44-1(a)(1), was inapplicable because the age of the victim was already what

made the defendant's crime a first-degree offense. It found aggravating factor two, "[t]he gravity and seriousness of harm inflicted on the victim," N.J.S.A. 2C:44-1(a)(2), applied to counts one, two, and seven because defendant manipulated the victims into not disclosing his assaults, knowing that his victims cared for their family. The court also found aggravating factor three, "[t]he risk that the defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3), applied because defendant committed multiple offenses against different victims, and because his psychological report[5] noted he was at high risk to commit another offense. It also found that aggravating factor four, "defendant took advantage of a position of trust or confidence," N.J.S.A. 2C:44-1(a)(4), applied only to counts one and seven to avoid double counting because defendant took advantage of a position of trust by telling the victims the family would be destroyed if they disclosed anything. Last, given defendant's "consistent denial of involvement and lack of remorse," the judge found aggravating factor nine, "[t]he need for deterring the defendant," N.J.S.A. 2C:44-1(a)(9), applied to deter him from violating the law. The only mitigating factor the judge found was factor seven, whether defendant previously led a law-abiding life, N.J.S.A.

---

[5] The full psychological report is not contained in the record, though some excerpts are contained in the adult presentence report.

2C:44-1(b)(7), as defendant only had one misdemeanor prior to the current offenses.

After weighing the aggravating and mitigating factors, the trial court was "clearly convinced" that the aggravating factors substantially outweighed the mitigating factors. It also determined that parole ineligibility periods applied under N.J.S.A. 2C:14-2 and NERA, N.J.S.A. 2C:43-7.2, and that consecutive sentences were warranted.

The trial court found consecutive sentences were appropriate, given that defendant engaged in a pattern of behavior amounting to a series of separate offenses. The judge found there were two victims and the crimes committed on each were separate, independent acts of sexual assault as they were committed at different times and places. Even though defendant's ultimate goal may have been the same as to each victim, the court did not consider them as part of a single period of abhorrent behavior.

### B.

We review sentencing decisions under an abuse of discretion standard. State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Whitaker, 79 N.J. 503, 512 (1979)); see also State v. Fuentes, 217 N.J. 57, 70 (2014) ("Appellate courts review sentencing determinations in accordance with a deferential

standard. The reviewing court must not substitute its judgment for that of the sentencing court."). We will affirm a trial court's sentence unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Trial courts have broad sentencing discretion as long as the sentence fits within the statutory framework. State v. Dalziel, 182 N.J. 494, 500 (2005). They must identify and consider "any relevant aggravating and mitigating factors," State v. Case, 220 N.J. 49, 64 (2014), that "are called to the court's attention," ibid., (quoting State v. Blackmon, 202 N.J. 283, 297 (2010)), and "explain how they arrived at a particular sentence," id., at 65 (2014).

In determining whether to impose a consecutive sentence, the judge undertook the analysis required by State v. Yarbough, 100 N.J. 627, 643-44 (1985). There, the Court set forth the following criteria for determining whether to impose concurrent or consecutive sentences:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;

(2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;

(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

(a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and

(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.

[Ibid. (footnote omitted).]

A-3476-16T4

Applying these controlling principles, we conclude the trial court did not abuse its discretion in sentencing defendant. Although his sentence was lengthy, the court properly performed a qualitative analysis of the applicable aggravating and mitigating factors. It adequately explained its reasons for finding each factor, and appropriately considered the nature of each of defendant's offenses and the effects his conduct has had on the victims. Moreover, the court's imposition of consecutive terms, considering the multiple victims, was consistent with <u>Yarbough</u>. Given the broad discretion trial judges have in fashioning sentences, the judge's aggravating and mitigating factors were supported by credible evidence, and the sentence does not shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

37

A-3476-16T4